## CHARLES TAPPAN vs. SILAS BAILEY & others.

Where one gives a note as agent of a joint stock company of which he is a member, and a suit thereon is brought against other members of the company, he is a competent witness to prove his authority as agent, and also to prove other facts necessary to support the action.

Where a company was formed for the purpose of purchasing timber land in Maine, and getting the lumber therefrom and selling it, and officers were appointed to take the general management of the concerns of the company, with power to appoint agents to transact its business; it was *held*, that an agent, appointed by such officers, had authority to give a negotiable note of the company in payment for services of laborers employed by him in getting out lumber, and that the members of the company, as partners, were liable to an action by the indorsee of such note.

ASSUMPSIT by the indorsee of the following note: "Norridgewock, Me. April 1st 1837. For value received I promise to pay Albert G. Manley, or his order, three hundred dollars, at the Lincoln Bank in Bath, on the first day of September, 1838, with interest after the first day of July next. David Wilder, jr., as agent of the Kennebec Lumber Co."

At the trial, the plaintiff, in order to prove that the defendants were members of the Kennebec Lumber Company, and that Wilder was the agent of the company, introduced evidence tending to show that there was a company, of many individuals, formed in the county of Worcester, in 1835, to purchase a township of land in Maine, and to manage the same by disposing of the lumber upon it ; that the defendants had either attended the meetings of the company, or acknowledged themselves to be members of it ; and, among other evidence, he introduced articles of agreement, whereby sundry persons associated together as the Kennebec Lumber Company ; which agreement was signed by the defendants, among others.*    He also intro-

---

* Extracts from the indenture by which the members of the Kennebec Lumber Company were bound to each other.

And it has been agreed and is intended by all the several persons, parties to this indenture, of the first part, that they, with their associates, shall form a joint stock company, under the name and style of the Kennebec Lumber Company, to raise the sum of $ 123,168, as a capital stock, to be divided into one hundred shares of the value and price of $ 1232 each. That each person shall be entitled to so many shares thereof, as shall be subscribed for by him after his signature to this indenture. And it is further intended and agreed, that all such

duced a circular notice, issued by the clerk of the company, by direction of the directors, a copy of which had been sent by him to each stockholder in the company, dated August 1st 1836, calling the annual meeting of the company on the 31st of that month, and a "letter from the agent," dated "Gardiner, Maine, June 25, 1836," addressed to Jesse W. Goodrich Esq., and signed by "David Wilder agent."

The plaintiff then proved that said Goodrich caused an advertisement to be published, on the 14th of September 1836, and in three successive weekly numbers of two newspapers

real estate described in said deed, [namely, a deed of certain woodland in Maine] and such as may be hereafter purchased by said company, shall be vested in trustees, to hold upon the trusts herein contained, and manage and improve the same for the benefit of said parties of the second part, their heirs, executors, administrators and assigns, as and in the nature of personal estate, and in proportion to the number of shares owned and held by each, respectively.

That the several persons, parties to this indenture, of the first part, with their associates and successors, shall be and continue an association and joint stock company of proprietors, under the name and style of the Kennebec Lumber Company, from the day of the date hereof until the dissolution thereof in manner hereinafter provided, and will each be subject to observe and well and truly perform the terms, articles and regulations, hereinafter contained, &c.

Art. 15. At the annual meeting of the proprietors, they shall elect by ballot from their number a president and five directors. The president shall be, *ex officio*, member of the board of directors, &c.

Art. 16. The president shall preside, &c., and exercise general supervision over all the concerns of the company, and the conduct of its officers.

Art. 20. The directors shall have the general management and superintendence of the business and affairs of the company, subject to the votes, orders and control of the proprietors in their meetings, and shall do all things necessary and proper to carry the same fully into effect.

Art. 21. The directors may employ all such agents as shall be needed to transact the business of the company in the best manner, and shall determine the reasonable compensation to be allowed to the trustees and other officers and agents.

Art. 26. The directors shall have the control, management and administration of all the affairs, and prudential and pecuniary concerns of the company, in all cases not otherwise provided for in and by this indenture.

Art. 35. The books of records of the company shall be open at all times to the inspection of any proprietor, trustee or officer, and shall be admissible evidence of all facts contained therein, in all suits and questions between the persons who may become parties to this indenture, and those claiming under them.

printed in Worcester, of which the following is a copy : "Kennebec Lumber Company. The annual meeting of the stock holders of this company for the choice of officers, and the transaction of other business, was held at the Worcester House, on Wednesday the 31st of August last. The following are the officers for the year ensuing. [Here the names of the several officers were inserted.] David Wilder, jr. has again been appointed agent to superintend the lumbering operations upon the land and river. The company in August A. D. 1835, with a capital stock of $123,200, one half of which is now paid in. The quantity of timber cut and sold from their land, last season, was from five to six millions feet, and the directors are now adopting measures to have double that quantity taken off during the coming winter. Per order of the Board of Directors. Worcester, Sept. 7, 1836."

The plaintiff also put into the case a letter from said Goodrich, dated December 11th 1837, addressed to Messrs. R. & F., who held certain demands against the company for collection, written upon the blank leaf of a circular letter sent to each of the stockholders of the company, dated December 1837, in which " the officers of the company, the present year " are named, and among these " agent to superintend the cutting and running of the timber on the land and river, David Wilder jr., of Bath."

Charles G. Prentiss, clerk of the company in 1835 and 1836, testified that David Wilder jr. was chosen agent by the directors, in September 1835, and that his election was recorded in the directors' books, and that he understood his agency to extend to the management of the company's affairs in Maine.

The plaintiff then introduced the deposition of Stephen Jewett of Bath, Maine, who testified that Wilder acted as the Maine agent of the company, in the years 1836, 1837, and 1838, at Bath, at the Chase Stream Township, which was owned by the company, and on the Kennebec River ; that he had transactions with said agent to the amount of nearly $50,000, and never heard his agency denied by any of the company, not having seen nor communicated with any of them, except Goodrich, Wilder,

and one Bowers, who is not one of the defendants, that Wilder bought supplies for the operations on the township, some of the bills of which, to the amount of $1000, the deponent had paid; that said Goodrich knew of these transactions by said agent, and was at times at Bath; and that the money, arising from the operations on the land, passed through the hands of said Wilder and said Goodrich; but principally through the hands of Wilder, that Goodrich and one Bowers, another member of the company, were at Bath and looked over the accounts of Wilder's doings with the deponent, and appeared to be satisfied with his doings as agent.

To prove the handwriting of Manley, the indorser of the note, the plaintiff called the said Wilder. The defendants objected to his competency, on the ground that he, being a member of the company, was interested to charge the defendants to contribute towards payment of the note, although he was not a party to this suit. This objection was overruled, and he was admitted and testified to the indorser's handwriting.

The defendants denied that Wilder was their agent, or that, as such, he had a right to bind them by signing notes in their names; and they contended that the present note was due from him individually, if at all; that there was no occasion for his giving the note, nothing being due to said Manley at the date thereof, though the amount would become due to him before the note became payable. The defendants then introduced a contract made between said Wilder and the president and directors of the Kennebec Lumber Company, dated September 21st 1835, whereby said Wilder engaged to get off logs from their land, for three years, at a certain rate per thousand feet.

The plaintiff thereupon called said Wilder again as a witness, and he testified that said written contract, of the date of September 21st, was given up and terminated by him and the directors of the company, on or about the day of the annual meeting of the company in 1836, when all his accounts for operations up to that time were settled by him and the directors, and a memorandum for the balance due to him was given to him by the directors; that it was thought advisable to change the mode of

carrying on their operations, and that he was appointed agent of the company, by said directors, to superintend their lumbering operations in Maine, under a salary by the year, and that he acted as such, from August 1836, till 1839, and resided in Maine for that purpose. He testified that he had not funds of the company sufficient to carry on these operations, without running them in debt; that the purchasers of the lumber made certain advances, before receiving it, to enable him to make advances to those whom he employed to cut, haul, and run the lumber; that these advances generally covered about half the amount of these charges; and that credit was given by the operators during the winter season, until the following July, or longer, by which time the owners of the lumber expected to get the same to the mills of the purchasers; that this note and another were given to Manley for labor and supplies on the lands, and was the bal ance due to him on the 1st of April 1837, for operations during the preceding winter; that the note was given payable at a longer time than the 1st of July, because it would be a convenience to the company to have the credit, and would answer the purpose of the payee: That he was not certain whether he had received funds of the company, by the first of July, sufficient to pay this debt, but his impression was that he had not. That he used some of the funds he received in advance, in the spring of 1837, to pay certain debts which he had personally contracted on account of the company, the year preceding, in carrying on their operations; which funds, so used, he applied towards the discharge of the balance due to him from the company the previous year, for which he held the directors' memorandum above mentioned; that he gave several notes to workmen and those furnishing supplies in the lumbering operations of the company, and that he rendered an account of the debts due for these operations from time to time, to the directors of the company, but not till long after the note was given, in which he stated whether they were due by note or on account; and that upon the workmen's leaving the land, in the spring, to go to their homes, he always gave them some memorandum, or written evidence of the balance due to them for labor or supplies.

45*

The defendants contended that, under the articles of association aforesaid, neither the directors nor their agent had a right to contract debts whereby to charge the stockholders, and that the defendants were not liable by reason of having signed said articles of association ; all the stock not having been subscribed for.

The plaintiffs contended, *first*, that by said articles, the directors and their agent had the right to contract debts in carrying on the lumbering operations of the company ; and, *secondly*, if they had not, the company were bound by the acts of their agent, so far as strangers were concerned, by reason of having held themselves out to the world as partners, by their advertisements in the case, and otherwise, as before stated.

The judge, having intimated his views upon these points, the case was taken from the jury by consent of the parties, for the consideration of the whole court, upon the report of the case. A nonsuit or default to be entered, or a new trial to be ordered, as the court shall direct.

The defendants objected to the above mentioned circulars, as evidence, because it was not proved how they were sent to the stockholders, nor that they were ever received by the defendants, or made known to them ; also to said notices published in the newspapers, because there was no proof that the defendants ever saw them. They also objected that it did not appear that a portion of these defendants were ever present at any meeting of said company, or consented to any of said operations, or that they ever had notice, in any of the calls for a meeting of said company, that any operations were to take place on said land ; or that they had knowledge of the above described doings of the said company, or their directors. They also objected to the proof of the appointment of D. Wilder jr. as agent, by parol.

It appeared that the whole number of 100 shares in the capital stock of the company was not subscribed for, before the aforesaid proceedings were had.

This case was argued at the last October term.

*Washburn,* for the plaintiff.

*C. Allen & Wood,* for the defendants.

SHAW, C. J.   In regard to the competency of Wilder as a witness, it appears to us, that upon the ground mainly relied upon, the objection goes to his interest in the question, and not in the event of the cause.   The ground is, that having assumed to act and make this note, in the name and by the authority of the company, if he was not so authorized, he was personally bound by the contract, so that charging the company would tend to relieve himself from that responsibility.   This is obviously an interest in the question only, because the judgment in this case, on whichever side it may be given, could not be given in evidence in a suit against him.   Besides ; by the general rule, an agent is competent to prove the authority, under which he acted, and the acts done under it.   As a mere member of the company, Wilder is called to testify against his interest, because it is to charge the company with a debt, to the payment of which he will be liable to contribute.   *Blackett* v. *Weir*, 5 Barn. & Cres. 385.   *Hall* v. *Curzon*, 9 Barn. & Cres. 646.

And upon the general question, the court are of opinion, that the articles constitute the signers a joint stock company, unincorporated, and thereby made them partners.   Looking at the general purposes expressed in the articles, and the name assumed by the company, indicating that they were not a mere land company, to purchase lands, in the expectation of a profit on the resale ; and considering the manner in which they immediately went into operation, there is sufficient evidence to show, that the object of this partnership was, that of felling and getting out lumber from the tract of land mentioned in the articles, and other tracts of land in Maine, contemplated to be bought ; preparing and getting such lumber to market ; and selling it for the mutual profit and benefit of the shareholders.   And it is a well known rule of law, that an agreement to carry on business by two or more jointly, and to share the profits, makes them responsible for all losses, and binds them by all contracts made by any of the partners or their agents, which are necessarily incident to carrying on the contemplated business.   And in this case, we do not think that the complete formation of the partnership depended on the condition of 100 shares being subscribed for ; there being no such condition expressed in the articles.

Then the remaining question is, whether Wilder, the agent, had authority to give a negotiable promissory note to bind the company. This must depend upon the terms of the articles of partnership, and the nature and purposes of the business to be carried on. If these are such, as from their nature, to require the drawing, indorsing and negotiating of bills of exchange and promissory notes, the agreement would imply an authority to the parties respectively, and to the agents employed to carry on the business of the company, so to draw, indorse, accept and negotiate bills of exchange and promissory notes. Supposing the object of the company were to carry on the business of banking, where private banking is not prohibited by law ; we could have no doubt that such authority would be implied from the nature of the contemplated business. So if the object were to establish a trading company, in which the use of a large capital is necessary, and in the conduct of which it is convenient and use-ful, if not necessary, to make negotiable contracts, and it is usual to do so.

In this case, the articles are voluminous, and it is difficult, without an attentive examination, to ascertain precisely the objects of the subscribers. We think, however, it sufficiently appears that one object was, to get out lumber and bring it to market. The articles provide for the annual election of directors, and they authorize the directors to appoint agents. They also provide for the choice of a president, who shall superintend the doings of all other officers ; and the president and directors are charged with the general management of the interests of the company. The evidence proves the appointment of Wilder, as the general agent of the company, to carry on the lumbering business in Kennebec, that the president was occasionally there, to superintend the proceedings, and that he reported his doings from time to time, to the company.

Here it is in proof, that the note in question was given for services actually done and performed by the promisee. Now without deciding whether this was so far a trading company, either by the express provisions of the articles, or by the nature of the business to be carried on, as that the company would be

bound to an indorsee, on bills of exchange or promissory notes, simply upon proof of the drawing, indorsement, acceptance or promise of an agent, and without proof of consideration, we are of opinion that the agent had authority to make contracts for labor and services, in the business of getting out lumber, and to give the negotiable promissory note of the company, in satisfaction of such labor and services, and that an action may be sustained upon it, by an indorsee. We think the consideration may be proved by evidence *aliunde*, and that it is satisfactorily proved that the note, in the present case, was given on a consideration, showing that it was within the scope of the agent's authority ; and there is no intimation that the defendants have any set-off, or other defence which would have availed them, if the suit had been brought by the promisee.

*Defendants defaulted.*